# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID SHAUN BENNETT, | 1:08-cv-01573-LJO-DLB (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| | [Doc. 1] |
| KEN CLARK, Warden | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Correction and Rehabilitation following his 1989 conviction for first degree murder. Petitioner was sentenced to a 27-years-to-life sentence.

In the instant petition, Petitioner does not challenge the validity of his conviction; rather, Petitioner challenges the Board of Parole Hearings' ("Board") 2006 decision finding him unsuitable for parole.

On August 2, 2007, Petitioner filed a state petition for writ of habeas corpus in the Santa Clara County Superior Court, alleging that the Board's 2006 decision denying him parole violated his due process rights because there was no evidence of his current dangerousness to the public. (Exhibit A, to Petition, Exhibit B, to Answer.) On August 3, 2007, the superior court denied the petition stating "because there is 'some evidence' that Petitioner's recent disciplinary reports (128 & 115) suggest he is not yet reformed, Petitioner's post crime actions appear to

show unsuitability under the 'detailed standards.'" (Exhibit B, to Answer.)

On October 18, 2007, Petitioner filed a state petition for writ of habeas corpus in the California Supreme Court, which was summarily denied on April 16, 2008. (Exhibits C & D, to Answer.)

Petitioner filed the instant federal petition for writ of habeas corpus on June 4, 2008. Respondent filed an answer to the petition on January 26, 2009. (Court Doc. 17.) Petitioner did not file a traverse.

## STATEMENT OF FACTS[1]

> On June 10, 1989 at approximately 10:45 p.m. officers of the Mountain View Police Department responded to the parking lot of a Burger King restaurant at 175 E. El Camino Real in Mountain View California, the scene of a reported shooting. Upon arrival, officers observed fire department personnel attending to a female subject, later identified as Linda Flores, . . ., who was lying on the ground. The officer advised Charlotte Flores, the victim's 18-year-old daughter who had witnessed the shooting was sitting in the back seat of a parole car. Charlotte Flores was contacted at which time she advised after she was feeling ill on the evening her mother had taken her to the El Camino Hospital for a treatment. . . .
> On their way home they decided to stop at the Burger King restaurant and have something to eat. The victim's daughter indicated that her mother suddenly yelled, "Oh, my God." At which point Charlotte observed a subject with a gun standing next to the driver's door of their vehicle. Charlotte indicated that her mother began to scream and honk the horn after which the defendant told her to "Shut up." Charlotte exited the vehicle and while running to a nearby restaurant to call for help she heard two gunshots. The victim's daughter then proceeded into the restaurant where she reported that her mother had been shot and asked for assistance. The police were subsequently summoned. The defendant had been last seen running eastbound on the El Camino Real and a description provided by a witness was broadcast. The victim, Linda Flores, age 37, was transported to El Camino Hospital Emergency Room where she was pronounced dead upon arrival. According to the coroner's report, the cause of death was reported as a gunshot wound of the face and neck. The bullet reportedly entered the left side of the victim's face and was recovered from the area of the cervical spine. The defendant was apprehended at approximately 11:15 that evening after seen walking eastbound on El Camino Real. Responding police officers placed handcuffs on the defendants while searching his outer clothing, the .38 caliber revolver believed to be the suspect's weapon was found in the defendant's front waistband. As the search continued, the defendant stated, "I did it man, I did it." The defendant further stated, "Take me to jail." The defendant also stated during the arrest process, "She didn't die, did she? I was very nervous." Those statements were reportedly made spontaneously by the defendant. It was noted that the defendant asked several times if the officers had information with regard to the status of the victim and asked, "How much time do I get for this?" Following his arrest, blood samples showed the presence of cocaine in the

---

[1] This information is taken verbatim from the Transcript of the December 4, 2006 parole hearing, which quoted from the Probation Officers Report. (Exhibit A, to Answer, at 10-15.)

|   |   |
|---|---|
| 1 | defendant's system. The defendant was later questioned and asked for waiving his Miranda Rights [sic] and the defendant revealed his attentions were to, "Steal |
| 2 | the girl's car." The defendant related that while holding the gun, he told the victim and her daughter he did not want to hurt anybody and to get out of the car. |
| 3 | He stated he ordered them to do so and not give him any problems; however, the victim started screaming and honking the horn on the car. He stated that when the |
| 4 | victim was reaching for her seatbelt he was afraid she had a gun. The defendant stated that he became nervous, started to run and fire the gun at the same time. |
| 5 | He stated, "It just all happened so fast." The defendant revealed he pulled the trigger once and then ran and jumped over a fence next to a highway and |
| 6 | continued running. He states that he then switched his shirt and his jacket around and walked on. The defendant was asked if he knew where he had shot the |
| 7 | victim, at which time the defendant answered, "I figured right in the middle somewhere." When asked if he knew he hit the victim when he pulled the trigger, |
| 8 | the defendant answered, "I kind of figured I did. Yeah, I was close enough and pointed it at her, so I figured it would hit her." When asked if he thought if he |
| 9 | might have killed the victim, the defendant answered, "I wasn't thinking about it when I shot her. Afterwards, I started thinking about it. That's why I was asking |
| 10 | the police officers what happened." When told the victim had not survived the attack, the defendant said, "I'm washed up now." He then said, "I feel like |
| 11 | crying." |

(Exhibit A, to Answer, at 10-15.)

## DISCUSSION

I.    Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a

state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging [her] underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its

4

1  independent judgment that the relevant state court decision applied clearly established federal
2  law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.
3  A federal habeas court making the "unreasonable application" inquiry should ask whether the
4  state court's application of clearly established federal law was "objectively unreasonable." Id. at
5  409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

II.    Review of Petition

A parole release determination is not subject to all the due process protections of an adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see also Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for procedural protections that particular situations demand). "[S]ince the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole board proceeding, the only process to which an inmate is entitled is: 1) the inmate must receive advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an "opportunity to be heard," Greenholtz, 442 U.S. at 16; 3) if the inmate is denied parole, the inmate must be told why "he falls short of qualifying for parole," Id.; and 4) the decision of the Board must be supported by "some evidence" having an indicia of reliability.

Superintendent, Mass. Correc. Inst. v. Hill, 472 U.S. 445, 455 (1985); Cato v. Rushen, 824 F.2d 703, 705 (9th Cir.1987).

"In Superintendent v. Hill, the Supreme Court held that 'revocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record.' 472 U.S. 445, 454 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass, 461 F.3d at 1128. In determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence. Id. Rather, the Court must determine whether there is any evidence in the record that could support the conclusion of the disciplinary board. Id., *citing* Superintendent v. Hill, at 455-56. Although Hill involved the accumulation of good time credits, the same standard applies to parole, as both situations "directly affect the duration of the prison term." Id., *citing* Jancsek v. Oregon Bd. of Parole, 833 F.2d at 1390.

In making a determination whether an inmate is suitable for parole, the Board is guided by the following regulations:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
>
> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 Cal. Code Regs. §§ 2402(a) and (b).

In this case, with regard to the procedural protections outlined in Greenholtz, Petitioner was provided all that is required. Petitioner was given advance notice of the hearing, he was offered representation by counsel at the hearing, he was granted an opportunity to submit

materials for the Board's consideration and an opportunity to be heard during the hearing, and he was provided a written decision explaining the reasons why parole was denied. See Exhibit A, to Answer.

The California Supreme Court clarified the standard of the review applicable to parole decisions by the Board or Governor in In re Lawrence, 44 Cal.4th 1181 (2008). The applicable standard "is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." Id. at 1212 (emphasis in original and citations omitted). As to the circumstances of the commitment offense, the Court concluded that

> although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

Id. at 1214.[2]

At Petitioner's initial 2006 parole hearing, the Board relied on the circumstances of Petitioner's commitment offense, institutional behavior, and unfavorable psychological report in finding that he was not suitable for parole. (Exhibit A, to Answer, at 76-79.)

With regard to the circumstances of the commitment offense, the Board found that it was carried out in an especially callous manner.[3] While under the influence of drugs, Petitioner

---

[2] To this end, the Court recognized that its prior determination of "a focus upon the egregiousness of the commitment offense to the exclusion of other relevant evidence has proved in practice to obscure the core statutory emphasis upon current dangerousness, the manner in which courts apply the some evidence standard in evaluating the evidentiary value of the gravity of the commitment offense requires some clarification." In re Shaputis, 44 Cal.4th 1241, 1254 (citing Lawrence, 44 Cal.4th at 1213-1214.)

[3] Pursuant to Title 15, of the California Code of Regulations, Section 2402(c) sets forth circumstances tending to demonstrate unsuitability for parole when the prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
 (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
 (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
 (C) The victim was abused, defiled or mutilated during or after the offense.
 (D) The offense was carried out in a manner which demonstrates an exceptionally callous

7

approached the victim's vehicle at gunpoint and ordered her out of the car. The victim's eighteen-year-old daughter was in the backseat and was able to escape quickly to seek assistance. The victim began to scream and honk the horn, and Petitioner told her to "shut up." As the victim attempted to unbuckle her seatbelt Petitioner fired a gunshot sticking the victim in the face and neck which resulted in her death. The Board found the motive to be very trivial pursuant to § 2402(c)(1)(E), as Petitioner shot and killed the victim merely to acquire her vehicle which he did not need.

The factors of the commitment offense and trivial motive, coupled with Petitioner's misconduct during incarceration and unfavorable psychological assessment (discussed *infra*), provide "some evidence" that Petitioner continues to be a risk to public safety if released. See In re Lawrence, 44 Cal.4th at 1221 ("the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense.") Therefore, there is some evidence to support the Board's finding that the motive was very trivial.

The next factor the Board considered was Petitioner's institutional behavior. 15 Cal.Code Regs. § 2402(c)(6). Petitioner has received eleven serious rules violations (CDCR 115)[4] and eighteen counseling chronos (CDCR 128). The first serious rules violation occurred on January 16, 1990 for delaying lockup. The second occurred on January 24, 1990 for missing unit. The third occurred on May 21, 1990 for disobeying orders. The fourth occurred on October 29, 1990 for refusing to work. The fifth occurred on June 3, 1993 for disobeying a direct order. The sixth occurred on November 13, 1995 for threatening staff. The seventh occurred on November 20, 1995 for disobeying orders. The eighth occurred on March 10, 2003 for indecent exposure. The ninth occurred on May 28, 2003 for participation in a work stoppage.

---

    disregard for human suffering.
    (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

15 Cal.Code Regs. § 2402(c)(1)(A)-(E).

[4] A CDCR-115 documents misconduct which is a violation of law or which is not minor in nature. 15 Cal. Code. Regs. §§ 3312(a)(2), (a)(3)

1 The tenth occurred on March 10, 2004 for possession of contra-unity. The eleventh and last
2 occurred on July 15, 2004 for destruction of state property. (Exhibit A, to Answer, at 39.) This
3 certainly lends support to the Board's finding that Petitioner has "failed to demonstrate a positive
4 evidence of change" based on his continued misconduct during incarceration. (Id. at 77.)

The Board next considered that the psychological report of August 2006 by Dr. Ohring was not supportive of his release. As quoted by the Board, Dr. Ohring opined that:

> Within the controlled setting it appears that [Petitioner's] propensity for violence is less than that of the average level two inmate, comparing his violence retainable within the community at large this inmate will be somewhat higher due to his periodic negative disciplinary reports while incarcerated and because this crime involved a chronic lifestyle of substance abuse and addiction. More time is needed to participate in AA and NA groups and/or the Malatee Islam program for substance abuse.

(Exhibit A, to Answer, at 77.) This information was properly considered pursuant to § 2402(b) as the Board is allowed to consider "[all relevant, reliable information available to the panel" which includes information on a prisoner's "past and present mental state." See Cal. Code Reg. tit. 15, § 2402(b). Psychological reports are relevant evidence of which the Board is allowed to review and rely on in determining whether a prisoner is suitable for parole. Rosa v. Nielsen, 428 F.3d 1229, 1232-1233 (9th Cir. 2005) (per curiam).

Given the substantial role that drugs and/or alcohol played in the commission of the offense and his only recent participation in AA/NA, there is certainly some evidence to support the Board's finding that Petitioner's "gains are recent and he must demonstrate the ability to maintain the gains over an extended period of time." (Id. at 78.)

Pursuant to section 2402(d), the Board also considered the positive factors and commended Petitioner for obtaining his GED in 1989, recent participation in AA, completion of an Anger Management Class, Parenting Class, completion of the Interfaith relationship workshop, and work in PIA upholstery. (Id. at 78-79.) However, on balance the positive aspects did not outweigh the factors of unsuitability.

Petitioner contends that the Board "arbitrarily and capriciously denied" him parole "and did not properly use the rules." (Petition, at 6.) As set forth above, California Code of Regulations, title 15, section 2402 specifically defines the factors that the Board is to consider in

9

determining suitability for parole. Under this section, a life prisoner shall be found unsuitable for parole if, in the judgment of the panel, the prisoner will pose an unreasonable risk of danger to society if released from prison. 15 Cal. Code. Regs. § 2402(a). Subsections (c) and (d) provide the factors which tend to show suitability or unsuitability for parole. As recently explained by the California Supreme Court, ""under the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prison remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." In re Lawrence, 44 Cal.4th at 1212. The guidelines provided by the regulation and case law set forth a well-defined criteria for determining suitability for parole that is not unconstitutional or arbitrary, and such criteria was properly applied to the determination that Petitioner is not yet suitable for parole. Petitioner's claim to the contrary is without merit.

Petitioner further contends that the five-year denial violates his due process rights. By statute the Board may delay a prisoner's subsequent parole hearing for up to five years if the prisoner has been convicted of murder and the Board finds "that it is not reasonable to expect that parole would be granted at a hearing during the [next five] years." Rosas v. Nielsen, 428 F.3d at 1232; see also Cal. Penal Code § 3041.5(b)(2)(B). The Board set Petitioner's next hearing for five years based on the following: (1) circumstances of the commitment offense; (2) lack of sufficient participation in self-help programming and lack of evidence of positive evidence; (3) institutional behavior; (4) unfavorable psychological report; and (5) opposition by the District Attorney's Office. (Exhibit A, to Answer, at 79-80.) It is noteworthy that this was Petitioner's first parole consideration hearing as his minimal eligible parole date was December 21, 2007. At the time of 2006 hearing, Petitioner had only served 15 years of his 27-years-to-life sentence. The Board reiterated that Petitioner's gains were recent "and he must demonstrate an ability to maintain th[o]se gains over an extended period of time. (Exhibit A, to Answer, at 80.) The Board recommended that Petitioner become disciplinary free, upgrade vocationally, and

1 | continue to participate in self-help programming. (Id. at 80-81.) Considering the rationale expressed by the Board, it was certainly reasonable to defer the next hearing for five years. See e.g. Rosas v. Nielsen, 428 F.3d at 1232 (circumstances of prisoner's crime along with psychiatric reports was sufficient evidence to defer next parole hearing for five years).

Given the totality of the Board's findings, there is some evidence that Petitioner is currently a threat to public safety, and it cannot be said that the state court's resolution of Petitioner's claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence before the state court."

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and

2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   March 17, 2009                /s/ Dennis L. Beck
                                       UNITED STATES MAGISTRATE JUDGE